DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Proposed Attorney for the Debtor*
One North Lexington Avenue, 11th Floor
White Plains, New York 10601
Jonathan S. Pasternak, Esq.
Julie Cvek Curley, Esq.
(914) 681-0200
(914) 684-0288 Facsimile
jpasternak@ddw-law.com
jcurley@ddw-law.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re:

SHELLEY FOOD STORES, INC. II
d/b/a SHELLEY'S FOODSERVICE,

Chapter 11
Case No. 15-_____ (RDD)

                                        Debtor.
-----------------------------------------------------------------X

**AFFIDAVIT OF SCOTT GELLER PURSUANT TO LOCAL
BANKRUPTCY RULE 1007-2 IN SUPPORT OF DEBTOR'S CHAPTER 11
PETITION AND PURSUANT TO LOCAL BANKRUPTCY RULE 9077-1
IN SUPPORT OF AN ORDER SCHEDULING HEARING ON
<u>SHORTENED NOTICE ON FIRST DAY MOTIONS</u>**

STATE OF NEW YORK       )
                         )SS.
COUNTY OF NEW YORK   )

SCOTT GELLER, of full age, being duly sworn according to law, upon his oath, deposes

and states:

1.       I am the President of Shelley Food Stores, Inc. II d/b/a Shelley Foodservice (the

"<u>Debtor</u>"). The Debtor is a foodservice manufacturer and distributor in the Metro Tri-State area.

The Debtor serves over 250 healthcare facilities in a four state region. The Debtor partners with

many nationally recognized food service manufacturers to distribute food service items in the

healthcare channel.

2.      I am fully familiar with the Debtor's business affairs and operations, and am duly authorized to make this affidavit on the Debtor's behalf.[1]  I submit this affidavit (a) in support of the Debtor's petition for relief under Chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy</u> <u>Code</u>"), (b) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of this Chapter 11 case, and (c) to provide general information about the Debtor's business operations that are germane to the Debtor's First Day Motions (as defined below).  I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtor's business and furtherance of its restructuring efforts.

3.      Part I of this Affidavit provides an introduction to the Debtor and its Chapter 11 case and describes the circumstances giving rise to the commencement of this Chapter 11 case. Part II of this Affidavit sets forth the information required by Local Bankruptcy Rule 1007. Part III sets forth a summary of the First Day Motions and the basis for the request for a hearing on shortened notice on the First Day Motions.

## I.      <u>INTRODUCTION</u>

4.      On October 22, 2015 (the "<u>Filing</u> <u>Date</u>"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code.  Since the Filing Date, the Debtor has remained in possession of its assets and continued to manage its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

---

[1] The factual statements in this affidavit are based on my personal knowledge, information supplied to me by others under my supervision, my review of relevant documents, and my experience and knowledge of the Debtor's operations and financial condition.

5.      The Debtor's case has been initiated to effectuate a reorganization, through a DIP loan to aid in the Debtor's cash flow constraints, so that the Debtor can not only stabilize its operations, but grow is business subsequent to the massive hit it took as a direct result of Superstorm Sandy and its warehouse relocation from Jersey City, NJ to Newark, NJ.

### A.  **The Debtor's Business**

6.      The Debtor started as a family-run retail butcher shop business in 1950. Since its founding, it grew into a foodservice manufacturer and distributor to serve a customer base spanning New York, New Jersey, Connecticut, Pennsylvania and Delaware. The Debtor's current customer base consists of over three hundred (300) institutional healthcare accounts including, hospitals, nursing homes, adult day care, drug rehab and nonprofit feeders.  The Debtor's business is heavily embedded in New York – it services customers in the 5 boroughs, Long Island, Westchester, Duchess and Albany counties and is fully licensed to do business in the State of New York and files multiple registrations and tax returns with the State of New York. In addition to healthcare, the Debtor also serves the take-out Chinese food market and the Jamaican restaurant trade.  The Debtor employees thirty-five people and operates 8-10 refrigerated trucks and 2 refrigerated vans in a five state region Monday thru Friday fifty-two weeks a year.  The Debtor is USDA inspected.  It produces under its own private label across multiple proteins.  In additional to its private label, the Debtor has a thirty page product list of items it distributes from outside manufacturer's including, beef, pork, veal, lamb, chicken, turkey, cheese and other dairy items, produce, kosher, provisions, prepared foods and vegetarian

7.      The Debtor operated under two DBA's: Shelley's Met Supermarket and Shelley's Foodservice. As of Jan 2012, Shelley's Food Stores Inc employed approximately 48 people and generated $10 million a year in revenue across the two (2) divisions, with Shelley's Foodservice

generating approximately \$8-\$8.2 million a year in revenue and Shelley's Met Supermarket generating approximately \$1.89 million a year in revenue. Being that both divisions operated out of the same building at 700 Bergen Avenue, Jersey City NJ (which was owned by an affiliate entity), many resources were shared across divisions both above and below the line, including inventory, labor, utilities, insurance, maintenance contracts, supplies, and advertising.

**B.  The Effects of Superstorm Sandy**

8.      When Superstorm Sandy hit the Jersey City, NJ area on Monday, October 29, 2012, the Debtor's facility lost power for fourteen (14) days. The power loss impacted the Debtor's ability to operate at full capacity. The Debtor was unable to acquire wiring to run a rental remote generator, and as a result the Debtor lost its entire wholesale customer base.

9.      On November 7, 2012, and the Debtor began its cleanup efforts. Shelley's Met Supermarket was unable to reopen after the power was restore and all resources concentrated on reopening Shelley's Foodservice, the wholesale food service distribution.

10.     As a direct result of Superstorm Sandy, the Debtor lost \$300,000 in sales and \$140,000 in physical inventory, and had to lay off 18 employees. In order to recapture its wholesale customers, the Debtor lowered prices to attract business back and new customers, expand product offerings, lower the minimum purchase for deliveries, and built out its web presence with content site and online ordering.

11.     The power outage from Superstorm Sandy also had residual effects to the Debtor's facility; the refrigeration units had increased service calls, the gas powered water tanks needed to be replaced, and the facility became infested with rodents. As a result, the USDA put the Debtor under a building review. The outside dock with shipping vestibule was enclosed. The Debtor had to hire a mason to repair all exterior brick. The Debtor had to install pallet racks

4

throughout the facility. The Debtor had to replace equipment throughout the facility. The Debtor updated its financial software to allow for LOT tracking. The Debtor had increased exterminator costs due to the rodent infestation.

12.     Notwithstanding the Debtor timely and properly filing claims with its insurance carrier, the carrier only paid $25,000 on all notices of claims, stating that they were only paying businesses this claim limit based on the nature of the storm.  As a result of insurance not paying out for physical losses and business interruption, the Debtor was forced to aggressively try and sell its building and facilitate a move to a new location to grow out of its loses.

13.     The Debtor posted a loss of $264,788 as of December 31, 2012.  Without impact of Superstorm Sandy, the Debtor would have posted a yearend profit.  This was the first ever loss post by the company in its history.

14.     The Debtor was forced to spend working capital on getting the building sellable while at the same time incurring USDA mandated expenses and weekly losses due to lower margins after Superstorm Sandy and the loss of a $2 million retail business that occupied 40% of the building.

15.     Throughout 2013, the Debtor continued to operate at a loss. The USDA closed the facility over three (3) times in February, 2013 due to the infestation. The Debtor was forced to hold auction on its remaining dry goods, shelving and cases in the supermarket, and received 35% of the value of is grocery inventory.

16.     In April, 2013, the Small Business Administration (the "SBA") rendered its final determination for less than half of the requested physical loss at 6% for 7 years and no funds for business interruption due to the fact that wholesale revenue was continuing to grow after the storm, neglecting the fact that the wholesale sales alone could not replace the lost retail revenue

5

of $2 million a year from the supermarket business. The Debtor declined the loan due to the request to hold the building as collateral, which was unencumbered and for sale. Ultimately, the Debtor's affiliate entered into contract to sell the building, and the Debtor began scouting new locations.

17.     Since Superstorm Sandy, the Debtor had drawn down $350,000 on its line of credit with Chase Bank to assist with cash flow restraints. In June, 2013, the Debtor applied for a SBA7(a) loan with Grow America Fund to fund the relocation. Meanwhile, due to continued cash flow restraints, I loaned the Debtor $100,000 as working capital in July, 2013, and my father loaned $150,000 in August, 2013. In August, 2013, the Debtor's line of credit with Chase Bank was reviewed and frozen. The Debtor was given a three (3) month extension to February 7, 2014 to find alternative financing.

18.     In October, 2013, the Debtor finally began to break even, after posting losses for the past year. At the same time, the Debtor was approved for a $500,000 working capital loan but denied a construction loan. In November, 2013, the Debtor's accounts receivable increased over $400,000 due to the required 90-120 day credit offered to healthcare accounts, which compromises the Debtor's primary cash flow source once again. Also in November, 2013, the Debtor's affiliated closed on the sale of the building to AFSF Associates LLC ("AFSF"), necessitating the Debtor to relocate.

19.     In December, 2013, the Debtor finalized its plan to relocate to 93 Albert Avenue, Newark, NJ. The Debtor projected a 12-14 month time frame for the build out, with a move in date of May, 2014. As of December 31, 2013, the Debtor posted a loss of $61,000 for the year, with a cash need of over $800,000.

20.     The Debtor submitted a request to the New Jersey Economic Development

6

Authority (the "NJEDA") for a Superstorm Sandy loan request, with the monies earmarked to pay down the Chase Bank line of credit and remaining retail creditors, cover additional inventory needs, hire additional sales people and aid in accounts receivable growth.  The Debtor believed this strategy in conjunction with its expected move to a more logistically efficient location would allow the Debtor to grow solidly and resume earning profits by the end of 2014.

**C.  The Move to the Albert Avenue Facility**

21.     Accordingly, the Debtor endeavored to move its operations to Newark, New Jersey.

22.     The Debtor entered into a long term lease with 93 Albert Ave Urban Renewal Corp. with the intention of building out the building located at 93 Albert Avenue, Newark, New Jersey for the Debtor's distribution and USDA processing operations (the "Albert Avenue Facility"). The Albert Avenue Facility was constructed to be a 25,000 square foot warehouse with multiple tailboards and is located near a major transit artery.  When completed, the building was fitted out with two "state of the art" processing rooms with multiple blast freezers. In addition to processing rooms, a state of the art refrigerated box and freezer was also constructed onsite.  Both boxes have a total pallet capacity of 104 pallets.  The remainder of the warehouse contains 1500 square foot office space, employee spaces and over 12,000 square foot of dry good space.

23.     The move to the Albert Avenue Facility would allow the Debtor to attempt to complete two mergers with like-kind New Jersey based foodservice businesses.  The first company would increase the Debtor's top line revenue by $5 million per annum.  It will also expand the Debtor's presence in the institutional healthcare space in the four state region.  The second company will increase the Debtor's top line revenue by $8.3 million per annum.  It will

7

also afford the Debtor the ability to branch out into other foodservice customer segments, including diners, white table cloth restaurants, take-out, butcher shops and catering halls. In addition to the top-line growth, this new location will also allow the Debtor to operate in a more logistically efficient manner.  Lastly, this increased space affords the Debtor the opportunity to add to its healthcare product lines outside of the "center of the plate". The result of the mergers would be a consolidated $24 million per year in revenue enterprise.

24.     The Debtor financed the relocation to the Albert Avenue Facility and the buildout, with (i) a $1,500,000 Line of Credit loan from Santander Bank, N.A. ("Santander"), (ii) $1,093,940 Stronger NJ Business Loan and Security Agreement Working Capital from the NJEDA, and (iii) sale proceeds from the sale of the building to AFSF.

25.     While the Albert Avenue Facility was under construction, the Debtor entered into a month-to-month lease with AFSF. The Debtor projected the relocation to the Albert Avenue Facility to be completed in six (6) months, by May, 2014.

26.     Unfortunately, and unforeseen by the Debtor, starting in January 2014, the construction project at the Albert Avenue Facility was plagued by construction delays outside the Debtor's control, and was not completed until May, 2015, over one year longer than that projected by the Debtor.

27.     From the outset, it took the architect, mechanical engineer and Phelps Construction Group ("Phelps"), the general contractor on the project, four (4) months from January to April, 2014 to get PSE&G engineers to visit the site to work with the engineer in designing and approving the proper power configurations and drawings.

28.     Thereafter, in April, 2014, the Mechanical Engineer took another month to complete mechanical drawings. Finally, in May, 2014, all of the drawings were submitted to the

Newark building department.

29.     Between May, 2014 and July, 2014 Phelps could not get any response from the Newark building department regarding the construction permits. In anticipation of receiving the permits, the transformer was ordered from PSE&G, due to be delivered September, 2014. In July, 2014 Phelps was informed by the Newark building department that it lost the drawings. In August, 2014, the plans were resubmitted. Meanwhile, the electrical switchgear was ordered, but did not have a delivery date until December, 2014. In late August, 2014, the Newark building department issued a demolition permit only.

30.     By September, 2014, the Debtor still had no response from Newark Building Department on the construction permits. Finally, in October, 2015, the Newark building department issued the construction permit. In late October, 2014, the project begins construction.

31.     Shortly thereafter, the project was delayed once again; the PSE&G transformer was not being delivered until December, 2014. In December, 2014 the Debtor was informed that the switchgear it ordered in August, 2015 was sold to another customer.  The new switchgear order was scheduled for delivery in February, 2015.

32.     By January, 2015, the majority of construction was completed except electrical work and switch gear. In late February, 2015 the switchgear was delivered. In March, 2015 the project gears up again to finished electrical work and was completed in early April, 2015. However, the facility still did not have permanent power and the Debtor was waiting, once again at the mercy of PSE&G for an inspector to (i) inspect work and turn on the permanent power, (ii) install meters and wire meters to the switchgear, and (iii) complete fuse work at pole and turn transformer and switchgear on.  PSE&G completed this work in April, 2015 and turned on the permanent power, so that Phelps could complete the remaining work and testing and finally

9

apply to the building department to apply for a Certificate of Occupancy.

33.     The Debtor finally moved into the Albert Avenue Facility on May 8, 2015, one year later than projected.

34.     In addition to the financing from Santander, the Debtor's principals loaned an additional $1. 619 million, and the Debtor obtained a $1.093 million loan from the NJEDA.

35.     Due to the exceedingly long time delay and costs associated with the build out, the Debtor still owes approximately $510,908 to Phelps, its contractor.

36.     The time delays and unexpected costs in the construction resulted in the Debtor's cash reserves being completely depleted rendering the Debtor unable to buy sufficient product to fulfill its customer orders. In turn, the Debtor's customers have been withholding orders, or ordering from the Debtor's competitors, resulting in a significant decrease in cash flow, and an inability to stay current on its debt service to Santander.

37.     This summer, the Debtor decided it needed more of a "New York presence" for its existing and expending Westchester and New York State customer base. It therefore opened a satellite office, primarily used by me, in Tarrytown, New York. As our operations are deeply embedded in downstate New York where we have dozens of long time institutional customers, Tarrytown seemed like a perfect locale to service existing New York customers as well as expanding our customer base throughout Westchester, Rockland and upstate New York.

**D.  The Debtor's Reorganization**

38.     Although Santander has been cooperative and worked with the Debtor over the past year and negotiated several forbearance agreements, unfortunately the only way for the Debtor to turn its business around is with a new round of financing to improve cash flow and allow the Debtor to purchase sufficient product to fulfill all of its customer orders. Because the

Debtor's assets are already saddled with the Santander loans, the Debtor was unable to obtain financing without Santander agreeing to a subordination of its loans.

39.     Through this bankruptcy proceeding, the Debtor will seek to obtain a DIP financing loan, which upon Court approval, would give a DIP lender first liens on all post-petition accounts receivable, leaving Santander with (a) a first lien on all pre-petition accounts receivable; and (b) a second lien on all post-petition accounts receivable. The DIP loan would provide the Debtor with the cash flow it needs to bring its revenues back to $10.7 million, where it was prior to the 2015 move to Newark.

40.     Further, once the Debtor has stabilized its operations and cash flow, it intends on filing a plan to complete the mergers so that it can grow its business to its true potential, and obtain plan/exit financing to take out Santander and provide for future working capital needs...

41.     The needs and interests of the Debtor's creditors will best be served by the continued possession of its property and management of its affairs as debtor-in-possession under Chapter 11 until confirmation of a reorganization plan.

## II. <u>INFORMATION REQUIRED BY LOCAL BANKRUTPCY RULE 1007</u>

42.     In addition to the foregoing, Local Bankruptcy Rule 1007-2 requires certain information related to the Debtor, which is set forth below.

**Local Rule 1007-2(a)(1)**

43.     The Debtor owns and operates foodservice manufacturer and distributor located at 93 Albert Avenue, Newark, New Jersey.

**Local Rule 1007-2(a)(2)**

44.     This case was not originally commenced under Chapter 7 or 13 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>").

**Local Rule 1007-2(a)(3)**

45.     Upon information and belief, no committee was organized prior to the order for relief in this Chapter 11 case.

**Local Rule 1007-2(a)(4)**

46.     A list of the names and addresses of the Debtor's 20 largest unsecured claims, excluding those who would not be entitled to vote at a creditors' meeting and creditors who are "insiders" as that term is defined in 11 U.S.C. Section 101(31) is annexed as **Exhibit A.**

**Local Rule 1007-2(a)(5)**

47.     A list of the names and addresses of the five largest secured creditors is annexed hereto as **Exhibit B.**

**Local Rule 1007-2(a)(6)**

48.  A balance sheet is annexed as **Exhibit C.**

**Local Rule 1007-2(a)(7)**

49.     There are no publicly held securities of the Debtor.

**Local Rule 1007-2(a)(8)**

50.     None of the Debtor's property is in the possession of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or any agent for such entity.

**Local Rule 1007-2(a)(9)**

51.     The Debtor operates from the leased premises located at 93 Albert Avenue, Newark, New Jersey.  Debtor has, in the past several months, opened up a satellite office at 520 White Plains Road in Tarrytown, New York to better service and expand its existing Westchester, Rockland and New York customer base. I personally use that office for such operations.

**Local Rule 1007-2(a)(10)**

52.    The Debtor's assets and records are located at its principal place of business at 93 Albert Avenue, Newark, New Jersey.

**Local Rule 1007-2(a)(11)**

53.    Below is a list of actions or proceedings pending concerning the Debtor:

*Richard P. Perry v. Shelley's Beef, Inc. et al,* Superior Court of New Jersey, Hudson County: Law Division, Docket No. HUD-L-2282-14; Discrimination proceeding

**Local Rule 1007-2(a)(12)**

54.    The Debtor's senior management is:

Scott D. Geller, President
Bela MaKula, Chief Operating Officer
Steve Saias, Vice President of Procurement

**Local Rule 1007-2(b)(1) and (2)**

55.    The Debtor's estimated monthly payroll to employees for the thirty (30) day period following the Chapter 11 petition is approximately $150,000, which includes the Debtor's estimated monthly payroll and payments to officers, stockholders, and directors for the thirty (30) day period following the Chapter 11 petition in the amount of $15,000.

**Local Rule 1007-2(b)(3)**

56.    The Debtor estimates that it will operate at a slight loss in the 30-day period following the filing of the chapter 11 petition.  A 13 week projection including the minimum required 30-day budget is annexed as **Exhibit D**.

### III. FIRST DAY MOTIONS AND BASIS FOR REQUEST FOR HEARING ON SHORTENED NOTICE PURSUNT TO LOCAL BANKRUPTCY RULLE 9077-1

57.     Contemporaneously with this Chapter 11 filing, the Debtor expects to file a number of motions and applications (the "First Day Motions") as follows:

> (i)     Debtor's Motion for Orders: (i) authorizing the Debtor to (a) satisfy and, to the extent applicable, directing any payroll banks to honor pre-petition gross salaries, payroll taxes and related obligations to or for the benefit of the Debtor's employees, and (b) honor, in its discretion, pre-petition sick, vacation, personal, and similar themed days; and (ii) granting other related relief (the "**Employee Wages Motion**"); and

> (ii)    Debtor's Motion for an Orders (A) authorizing the Debtor (I) to obtain post-petition financing and granting security interests pursuant to 11 USC. §364(c); (ii) to use cash collateral pursuant to 11 USC §363; (iii) to provide adequate protection pursuant to 11 USC §361; and (b) scheduling a final hearing (the "**DIP Financing/Cash Collateral Motion**").

58.     In addition to the First Day Motions, the Debtor has filed an Application for entry of an order scheduling a hearing on shortened notice on the First Day Motions. The relief sought in the First Day Motions is immediately necessary to enable the Debtor to operate effectively as a debtor-in possession following the commencement of its chapter 11 case.

59.     The purposes of the First Day Motions include, among other things, to: (a) ease the Debtor's transition into Chapter 11 and mitigate potentially adverse effects of the Chapter 11 filing; (b) minimize disruption of the Debtor's ability to operate in the ordinary course of business; and (c) maintain and bolster employee morale so as to reduce employee attrition during the Debtor's Chapter 11 proceedings, which would have a detrimental impact on the Debtor's business and customer service.   Each of the First Day Motions is crucial to the Debtor's restructuring efforts and preservation of the Debtor's assets and estate.[2]

---

[2] For a more detailed description of the First Day Motions, the Debtor respectfully refers the Court and parties-in-

60.     I submit that the relief request in the First Day Motions should be heard and determined on an expedited basis in order to allow the Debtor to continue its normal business operations without any interruption, which interruption that could severally detriment the Debtor's ability to successfully reorganize.

## A.  Employee Wages Motion

61.     Due to the timing of this Chapter 11 filing, the Debtor respectfully requests, among other things, entry of the Interim Order authorizing the Debtor to satisfy and, to the extent applicable, directing any payroll banks to honor, certain pre-petition gross salaries and payroll taxes for its employees (the "Interim Order") submitted herewith.

62.     The Debtor's employees are critical and necessary for the Debtor's ongoing operations. Should the Debtor be rendered unable to pay its employees their wages as scheduled, there would be irreparable harm caused to the employee morale and possible loss of employees. Should this happen, the Debtor's reorganization efforts would certainly be impaired.

## B.  DIP Financing/Cash Collateral Motion

63.     As stated hereinabove, the Debtor is currently operating at a loss, and has inadequate cash flow, working capital, or borrowing availability from Santander. Prior to the Filing Date, the Debtor had exhausted substantially all of its cash assets, and was left in a position without cash to continue its operations. The Debtor explored numerous avenues of lending pre-filing, but, however, was unable to find any lender willing to lend to the Debtor given its current debt structure. The only avenue by which any lender would consider lending to the Debtor would be if the proposed lender would be given a first lien on post-petition receivables under a factoring agreement under Section 364(c) of the Bankruptcy Code.

interest to the respective First Day Motions.

Santander, in turn, would continue to hold a first lien and all pre-petition accounts receivable and a second lien on post-petition accounts receivable as adequate protection.

64.     In order to preserve the Debtor's assets and value as a "going concern" pending a sale in this Bankruptcy Case, DIP Financing is necessary to provide the Debtor with adequate cash flow to meet its very minimum operating expenses and administrative costs of maintaining its estate.

65.     As set forth in the budget annexed to the DIP Motion as Exhibit "D," the Debtor immediately requires financing to meet its ordinary and necessary expenses. The Debtor does not have the cash reserves necessary to sustain its operations, and thus additional funding is necessary to prevent irreparable harm and damage to the Debtor's estate.

66.     Further, without immediate relief from the Court authorizing the Debtor's use of cash collateral of its secured creditors, the Debtor would be unable to conduct its normal business operations, thereby crippling the Debtor's ongoing operations and jeopardizing its reorganization efforts.  I submit that the terms set forth in the motion for the use of the Cash Collateral are fair and reasonable, and reflect Debtor's exercise of prudent business judgment consistent with its fiduciary duties.

### C. <u>Conclusion</u>

67.     The First Day Orders will enable the Debtor to stabilize and continue its operations in the ordinary course while the Debtor seeks to reorganize under the Bankruptcy Code. Accordingly, the Debtor respectfully requests that the Court enter those Orders.

68.     Thus, I believe that good cause exists to have a hearing on the First Day Motions which typically requires a minimum of twenty-one (21) days' notice as provided for in Federal Rule of Bankruptcy Procedure 2002 and 6003.

## **CONCLUSION**

I request that the Court grant all of the relief requested in the First Day Motions and Applications.    Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

*/s/ Scott Geller*
Scott Geller, President

Sworn to before me this
22nd day of October, 2015

*/s/ Jonathan S. Pasternak*
Notary Public

**EXHIBIT A**

**20 Largest Unsecured Creditors**

B4 (Official Form 4) (12/07)

# United States Bankruptcy Court
## Southern District of New York

In re    Shelley Food Stores, Inc. II                Case No. _____

                           Debtor(s)         Chapter     11

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

Following is the list of the debtor's creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 [*or* chapter 9] case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. If a minor child is one of the creditors holding the 20 largest unsecured claims, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| *Name of creditor and complete mailing address including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | *Amount of claim [if secured, also state value of security]* |
| NJ Economic Development Auth.<br>Dir, Finance & Bond Portfolio<br>PO Box 990<br>Trenton, NJ 08625-0990 | NJ Economic Development Auth.<br>Dir, Finance & Bond Portfolio<br>PO Box 990<br>Trenton, NJ 08625-0990 | Aged Accounts Receivable<br>Current:<br>$430,116.34<br>31-60 Days:<br>$535,283.22<br>61-90 Days:<br>$366,669.95<br>91-120 Days:<br>$146,222.06<br>Over 120 Days:<br>$116,678.19 | | 1,093,904.00<br>(1,811,023.20 secured)<br>(2,500,000.00 senior lien) |
| Santander Bank, N.A.<br>824 N. Market Street, Ste 100<br>Wilmington, DE 19801-4937 | Santander Bank, N.A.<br>824 N. Market Street, Ste 100<br>Wilmington, DE 19801-4937 | Aged Accounts Receivable<br>Current:<br>$430,116.34<br>31-60 Days:<br>$535,283.22<br>61-90 Days:<br>$366,669.95<br>91-120 Days:<br>$146,222.06<br>Over 120 Days:<br>$116,678.19 | | 1,500,000.00<br>(1,811,023.20 secured)<br>(1,000,000.00 senior lien) |
| Phelps Construction Group<br>315 Wootton St<br>Boonton, NJ 07005 | Phelps Construction Group<br>315 Wootton St<br>Boonton, NJ 07005 | | | 510,908.00<br><br>(0.00 secured) |
| Nebraskaland Inc.<br>355 Food Center Drive<br>Building G<br>Bronx, NY 10474 | Nebraskaland Inc.<br>355 Food Center Drive<br>Building G<br>Bronx, NY 10474 | | | 141,103.90 |
| G & C Food Distributors<br>3407 Walters Road<br>PO Box 19000<br>Syracuse, NY 13209-9725 | G & C Food Distributors<br>3407 Walters Road<br>PO Box 19000<br>Syracuse, NY 13209-9725 | | | 124,352.70 |

B4 (Official Form 4) (12/07) - Cont.

In re     Shelley Food Stores, Inc. II                                    Case No. _____
                                    Debtor(s)

# LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS
(Continuation Sheet)

| (1)<br><br>*Name of creditor and complete mailing address including zip code* | (2)<br><br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br><br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br><br>*Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | (5)<br><br>*Amount of claim [if secured, also state value of security]* |
|---|---|---|---|---|
| West Side Foods<br>PO Box 740456<br>Hunts Point Post Office<br>Bronx, NY 10474 | West Side Foods<br>PO Box 740456<br>Hunts Point Post Office<br>Bronx, NY 10474 | | | 119,290.57 |
| 93 Albert Ave Urban Renewal<br>Attn: Christine Ambrosio<br>P.O. Box 821<br>Pine Brook, NJ 07058 | 93 Albert Ave Urban Renewal<br>Attn: Christine Ambrosio<br>P.O. Box 821<br>Pine Brook, NJ 07058 | | | 88,419.40 |
| Chase Card Services<br>PO Box 15153<br>Wilmington, DE 19886 | Chase Card Services<br>PO Box 15153<br>Wilmington, DE 19886 | | | 85,596.50 |
| Paramount Wholesale Foods<br>3351 Tremely Point Rd<br>Suite #2<br>Linden, NJ 07036-3575 | Paramount Wholesale Foods<br>3351 Tremely Point Rd<br>Suite #2<br>Linden, NJ 07036-3575 | | | 78,631.37 |
| Food Direct<br>355 Food Center Drive<br>Bronx, NY 10474-7000 | Food Direct<br>355 Food Center Drive<br>Bronx, NY 10474-7000 | | | 55,650.02 |
| Porky Products Inc<br>400 Port Carteret Drive<br>Carteret, NJ 07008 | Porky Products Inc<br>400 Port Carteret Drive<br>Carteret, NJ 07008 | | | 55,464.09 |
| American Express<br>P.O. Box 1270<br>Newark, NJ | American Express<br>P.O. Box 1270<br>Newark, NJ | | | 52,598.19 |
| Weichsel Beef Co., Inc.<br>525 West Street<br>New York, NY 10014-1503 | Weichsel Beef Co., Inc.<br>525 West Street<br>New York, NY 10014-1503 | | | 43,447.41 |
| Solomon Page Group LLC<br>P.O. Box 75314<br>Chicago, IL 60675 | Solomon Page Group LLC<br>P.O. Box 75314<br>Chicago, IL 60675 | | | 43,346.01 |
| Jetro Cash & Carry (Wholesale)<br>1 Amity Road<br>Jersey City, NJ 07304-3509 | Jetro Cash & Carry (Wholesale)<br>1 Amity Road<br>Jersey City, NJ 07304-3509 | | | 39,927.45 |
| National Beef Inc.<br>12200 North Ambassador Drive<br>Kansas City, MO 64163-1244 | National Beef Inc.<br>12200 North Ambassador Drive<br>Kansas City, MO 64163-1244 | | | 39,065.61 |
| Salem Truck Leasing Inc.<br>PO Box 369022<br>Brooklyn, NY 11236 | Salem Truck Leasing Inc.<br>PO Box 369022<br>Brooklyn, NY 11236 | | | 38,924.75 |
| Allwood Forlenza Agency<br>P.O. Box 1557<br>Clifton, NJ 07015 | Allwood Forlenza Agency<br>P.O. Box 1557<br>Clifton, NJ 07015 | | | 35,178.66 |
| Wilentz Goldman & Spitzer<br>90 Woodbridge Center Drive<br>Suite 900<br>Woodbridge, NJ 07095-1155 | Wilentz Goldman & Spitzer<br>90 Woodbridge Center Drive<br>Suite 900<br>Woodbridge, NJ 07095-1155 | | | 33,244.80 |

B4 (Official Form 4) (12/07) - Cont.

In re  Shelley Food Stores, Inc. II                                    Case No.  _____
_____
                    Debtor(s)

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS
### (Continuation Sheet)

| (1)<br><br>*Name of creditor and complete mailing address including zip code* | (2)<br><br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br><br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br><br>*Indicate if claim is contingent, unliquidated, disputed, or subject to setoff* | (5)<br><br>*Amount of claim [if secured, also state value of security]* |
|---|---|---|---|---|
| Clemens Food Group<br>2700 Clemens Road<br>Hatfield, PA 19440 | Clemens Food Group<br>2700 Clemens Road<br>Hatfield, PA 19440 | | | 31,726.74 |

## DECLARATION UNDER PENALTY OF PERJURY
## ON BEHALF OF A CORPORATION OR PARTNERSHIP

I, the President of the corporation named as the debtor in this case, declare under penalty of perjury that I have read the foregoing list and that it is true and correct to the best of my information and belief.

Date  October 22, 2015                        Signature    /s/ Scott Geller
                                                           Scott Geller
                                                           President

*Penalty for making a false statement or concealing property*:  Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C. §§ 152 and 3571.

Software Copyright (c) 1996-2014 Best Case, LLC - www.bestcase.com                          Best Case Bankruptcy

**EXHIBIT B**

**Five Largest Secured Creditors**

| Creditor | Amount |
|---|---|
| Santander Bank, N.A.<br>824 N. Market Street, Ste 100<br>Wilmington DE 19801 | $2,500,000.00 |
| NJ Economic Development Auth.<br>Dir, Finance & Bond Portfolio<br>PO Box 990<br>Trenton NJ 08625 | $1,093,904.00 |
| Phelps Construction Group<br>315 Wootton St<br>Boonton NJ 07005 | $510,908.00 |

**EXHIBIT C**

**Balance Sheet**

## SHELLEYS FOOD STORES, INC.
## STATEMENT OF ASSETS, LIABILITIES AND SHAREHOLDER'S EQUITY-INCOME TAX BASIS
## AS OF JUNE 30, 2015
(See Accountants' Compilation Report)

## ASSETS

**CURRENT ASSETS:**

| | | |
|---|---|---:|
| Cash | $ | 147,938. |
| Accounts receivable - net of allowance for doubtful accounts | | 1,986,793. |
| Inventory | | 420,000. |
| **TOTAL CURRENT ASSETS** | | 2,554,731. |

**FIXED ASSETS:**

| | |
|---|---:|
| Property and equipment-net of accumulated depreciation of | 3,074,652. |

**OTHER ASSETS:**

| | |
|---|---:|
| Business development costs | 183,604. |
| Security deposits | 48,526. |
| **TOTAL OTHER ASSETS** | 232,130. |

| | | |
|---|---|---:|
| **TOTAL ASSETS** | $ | **5,861,513.** |

## LIABILITIES AND STOCKHOLDER'S EQUITY

**CURRENT LIABILITIES:**

| | |
|---|---:|
| Accounts payable | 548,085. |
| Line of credit | 1,409,200. |
| Note payable | 928,917. |
| **TOTAL CURRENT LIABILITIES** | 2,886,202. |

**LONG TERM LIABILITIES:**

| | |
|---|---:|
| Loan payable shareholder | 2,322,850. |
| EDA loan | 1,093,904. |
| **TOTAL LONG TERM  LIABILITIES** | 3,416,754. |

**STOCKHOLDER'S EQUITY:**

| | |
|---|---:|
| Common Stock | 351,508. |
| Retained (deficit) | (792,951.) |
| **TOTAL STOCKHOLDER'S EQUITY** | (441,443.) |

| | | |
|---|---|---:|
| **TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY** | $ | **5,861,513.** |

**EXHIBIT D**

**30-Day Projections**

# Shelley's Foodservice
## Thirteen-week cash flow

DRAFT

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W/E 11/1 | W/E 11/8 | W/E 11/15 | W/E 11/22 | W/E 11/29 | W/E 12/6 | W/E 12/13 | W/E 12/20 | W/E 12/27 | W/E 1/3/16 | W/E 1/10/16 | W/E 1/17/16 | W/E 1/24/16 | Total $ |
| **Cash on Hand (beginning of week)** | - | 18,664 | 167,361 | 300,662 | 190,900 | 251,368 | 323,529 | 359,391 | 432,302 | 186,966 | 235,152 | 292,782 | 387,922 | - |
| | | | | | | | | | | | | | | |
| **CASH RECEIPTS** | | | | | | | | | | | | | | - |
| Collections from AR | 120,602 | 153,915 | 153,915 | 197,011 | 110,819 | 92,349 | 92,349 | 66,491 | 62,797 | 55,409 | 55,409 | 55,409 | 70,924 | 1,287,398 |
| Factoring of New Receivables @75% | | 80,752 | 80,752 | 80,752 | 80,752 | 88,827 | 88,827 | 88,827 | 88,827 | 88,827 | 122,137 | 122,137 | 122,137 | 1,133,555 |
| Rebates | 872 | | | | 810 | | | | | 872 | | | | 2,554 |
| **TOTAL CASH RECEIPTS** | 121,474 | 234,667 | 234,667 | 277,763 | 192,380 | 181,176 | 181,176 | 155,318 | 151,624 | 145,109 | 177,547 | 177,547 | 193,061 | 2,423,507 |
| **Total Cash Available (before cash out)** | 121,474 | 253,331 | 402,028 | 578,424 | 383,281 | 432,544 | 504,705 | 514,709 | 583,927 | 332,075 | 412,698 | 470,328 | 580,983 | 2,423,507 |
| | | | | | | | | | | | | | | - |
| Purchases | | 85,970 | | 327,045 | | 109,015 | | | 359,750 | | 119,917 | | 290,198 | 1,291,894 |
| | | | | | | | | | | | | | | - |
| Net wages | 60,375 | | 60,375 | | 60,375 | | 60,375 | | 60,375 | | 60,375 | | | 362,252 |
| Payroll Taxes (Includes withholding taxes) | 21,288 | | 21,288 | | 21,288 | | 21,288 | | 21,288 | | 21,288 | | | 127,725 |
| Payroll Processing Expenses | 744 | | 744 | | 744 | | 744 | | 744 | | 744 | | | 4,464 |
| Supplies - E-Z Edge | | | | 60 | | 60 | | | | | | | 60 | 180 |
| Supplies - New Brunswick Saw | | | | 359 | | 359 | | | | | | | 359 | 1,077 |
| Supplies - Standard Casing | | | | 536 | | 536 | | | | | | | 536 | 1,609 |
| Supplies - Office Intrep | | | | 250 | | 250 | | | | | | | 250 | 750 |
| Supplies - Office Fed Ex | | | | 400 | | 400 | | | | | | | 400 | 1,200 |
| Supplies - Office Staples | | | | 450 | | 450 | | | | | | | 450 | 1,350 |
| R&M - Ehrlich Co. | | | | 983 | | 983 | | | | | | | 983 | 2,949 |
| R&M - Quality Refrigeration | | | | 403 | | 403 | | | | | | | 403 | 1,209 |
| Maintenance - Sigmiester | | | | 30 | | 30 | | | | | | | 30 | 90 |
| R&M - Uniforms Unifirst | | | | 786 | | 786 | | | | | | | 786 | 2,358 |
| Auto - Leasing Mendon | | | | | 6,700 | | | | 6,700 | | | | | 13,400 |
| Auto - Leasing Salem | | | | | 16,500 | | | | 16,500 | | | | | 33,000 |
| Auto - Violations | | | | | 250 | | | | 250 | | | | | 500 |
| Auto - Fuel Comdata | | | | | 5,300 | | | | 5,300 | | | | | 10,600 |
| Auto - Fuel Rastall Oil | | | | | 8,400 | | | | 8,400 | | | | | 16,800 |
| Auto - GPS | | | | | 61 | | | | 61 | | | | | 122 |
| Professional Fees - Preferred Pension | | | | | | | | | | | | | | - |
| Professional Fees - Advanced Acceptance | | | | 660 | | 660 | | | | | | | 660 | 1,980 |
| Sales Commisions | | | | 1,900 | | 1,900 | | | | | | | 1,900 | 5,700 |
| Professional Fees - Garden Lab | | | | 250 | | 250 | | | | | | | 250 | 750 |
| Rent - 93 Albert Ave Urban Renewal | | | | 17,684 | | 17,684 | | | | | | | 17,684 | 53,052 |

# Shelley's Foodservice
## Thirteen-week cash flow

*DRAFT*

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | W/E 11/1 | W/E 11/8 | W/E 11/15 | W/E 11/22 | W/E 11/29 | W/E 12/6 | W/E 12/13 | W/E 12/20 | W/E 12/27 | W/E 1/3/16 | W/E 1/10/16 | W/E 1/17/16 | W/E 1/24/16 | Total $ |
| Rent - Preferred Freezer | | | | 300 | | | 300 | | | | | | 300 | 900 |
| Utilities - Telephone | | | | 1,000 | | | 1,000 | | | | | | 1,000 | 3,000 |
| Utilities - G&E Direct Energy | | | | 3,500 | | | 3,500 | | | | | | 3,500 | 10,500 |
| Utilities - PSE&G | | | | 1,500 | | | 1,500 | | | | | | 1,500 | 4,500 |
| Utilities - Water | | | | 729 | | | 729 | | | | | | 729 | 2,187 |
| Utilities - Darling International | | | | 320 | | | 320 | | | | | | 320 | 960 |
| Utilities - Waste | | | | 1,750 | | | 1,750 | | | | | | 1,750 | 5,250 |
| Insurance - Gen Re & Works | | | | 13,200 | | | 13,200 | | | | | | 13,200 | 39,600 |
| Insurance - BCBS | | | 10,559 | 7,500 | | | 7,500 | | | | | | 7,500 | 33,059 |
| Insurance - Life Insurance AmerGen | | | | 71 | | | 71 | | | | | | 71 | 214 |
| Insurance - Life Insurance JUSA | | | | 353 | | | 353 | | | | | | 353 | 1,060 |
| Insurance - Life Insurance Grp | | | | 375 | | | 375 | | | | | | 375 | 1,125 |
| Insurance - SG Life Insurance Trust | | | 8,400 | | | | | | | | | | | 8,400 |
| Pension | | | | | | | 85,000 | | | | | | | 85,000 |
| Insurance - Pension Gaur corp. | | | | 800 | | | 800 | | | | | | 800 | 2,400 |
| Taxes (Corporate) | | | | | | | | | | | | | | - |
| Taxes (business, etc.) | | | | | | | | | | | | | 350 | 350 |
| Taxes (NJ Dept of Labor) | | | | | | | | | | | | | | - |
| Taxes (NYC Dept of Finance) | | | | 165 | | | | | | | | | | 165 |
| Taxes (Corporate) NYS | | | | | | | | | | | | | | - |
| Other (Union Dues) | 3,223 | | | 3,223 | | | 3,223 | | | | | | 3,223 | 12,891 |
| Other (Licenses) | | | | 125 | | | 125 | | | | | | 125 | 375 |
| Other (USDA) | | | | 150 | | | 150 | | | | | | 150 | 450 |
| Other (Security Effective Alarm) | | | | 167 | | | 167 | | | | | | 167 | 500 |
| Petty cash | | | | 500 | | | 500 | | | | | | 500 | 1,500 |
| **Subtotal Expenses** | 85,630 | 85,970 | 101,366 | 387,524 | 119,618 | 109,015 | 145,314 | 82,407 | 396,961 | 82,407 | 119,917 | 82,407 | 350,862 | 2,149,396 |
| **Cash Flow From Operations** | 35,844 | 167,361 | 300,662 | 190,900 | 263,663 | 323,529 | 359,391 | 432,302 | 186,966 | 249,668 | 292,782 | 387,922 | 230,121 | 274,112 |
| | | | | | | | | | | | | | | |
| **Chapter 11 Epenses** | | | | | | | | | | | | | | |
| Chapter 11 Professional Fees | | | | | | | | | | | | | | - |
| UST FEES | | | | | | | | | | | | | 6,500 | 6,500 |
| **Total Chapter 11 Expenses** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,500 | 6,500 |
| | | | | | | | | | | | | | | |
| **Bank Debt** | | | | | | | | | | | | | | |
| Bank Expense - Santander | 0 | | | 0 | | | | | | 0 | | | | - |
| Interest - LOC - Santander | 0 | | | 0 | | | | | | 0 | | | | - |

DRAFT FOR DISCUSSION PURPOSES ONLY

10/22/2015

# Shelley's Foodservice
# Thirteen-week cash flow

DRAFT

|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | W/E 11/1 | W/E 11/8 | W/E 11/15 | W/E 11/22 | W/E 11/29 | W/E 12/6 | W/E 12/13 | W/E 12/20 | W/E 12/27 | W/E 1/3/16 | W/E 1/10/16 | W/E 1/17/16 | W/E 1/24/16 | Total $ |
| Loan - Santander Term Loan Principal Only | 10,680 |  |  |  | 10,680 |  |  |  |  | 10,680 |  |  |  | 32,040 |
| Factor Facility and Startup Fees | 6,500 |  |  |  | 1,615 |  |  |  |  | 3,836 |  |  |  | 11,951 |
| **Total Bank Debt** | 17,180 | 0 | 0 | 0 | 12,295 | 0 | 0 | 0 | 0 | 14,516 | 0 | 0 | 0 | 43,991 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| **Cash Position (end of month)** | 18,664 | 167,361 | 300,662 | 190,900 | 251,368 | 323,529 | 359,391 | 432,302 | 186,966 | 235,152 | 292,782 | 387,922 | 223,621 | 223,621 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| **ESSENTIAL OPERATING DATA (non cash flow information)** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Sales Volume Credit Sales |  | 538,346 |  |  |  | 592,181 |  |  |  |  | 651,399 |  |  | 1,781,925 |
| Remaining Accounts Receivable |  | 1,539,147 |  |  |  | 923,488 |  |  |  |  | 554,093 |  |  |  |

Shelley's Foodservice
Thirteen-week cash flow assumptions

1)  Assumes beginning cash of $0

2)   Sales to be factored beginning week ending Nov 8, 2015 at 75%

- November   $538,000
- December   $592,000
- January      $651,000

3) Collections:

- $1.3 million of the current receivables of $1.5 million will be collected by end of 13 weeks
- New receivables  factored at 75%
  - November $80,700 per week for 4 weeks
  - December $88,827 per week for 5 weeks
  - January   $122,137 per week  for 4 weeks
- Assumes no collection on the remaining 25% during the 13 weeks.

4)  Purchases
- Assume a 19% historical Gross Profit.
- 75% of purchases assumed to be made on 30 day or less terms,  remaining 25% on 31-60 day terms.

5)  Operating Expenses based on historical  run rates for the period January through August of 2015.

6)  Bank Debt
- Assumes the payment of principal only of$10,680 per month to Santander
- Factor Facility Fees assumes startup costs of $6,500 and .5% of outstanding factored amount at the end of the month.

7)  Other
- Assumes no payment of Chapter 11 professional fees during the 13 week period
- Pension Payments of $85,000 in December of which a portion is pre petition
- Life insurance payment 0f $8,400 in November
- Assumes the pre petition Union Dues ($7,300) and Blue Cross ($10,000) will be cured.

DRAFT - FOR DISCUSSION PURPOSES ONLY