DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Proposed Attorney for the Debtor*
One North Lexington Avenue, 11th Floor
White Plains, New York 10601
Jonathan S. Pasternak, Esq.
Julie Cvek Curley, Esq.
(914) 681-0200
(914) 684-0288 Facsimile
jpasternak@ddw-law.com
jcurley@ddw-law.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re:

SHELLEY FOOD STORES, INC. II
dba SHELLEY'S FOODSERVICE,

                                          Chapter 11
                                          Case No. 15-_____ (RDD)

                              Debtor.
-----------------------------------------------------------------X

**DEBTOR'S MOTION FOR ORDERS (A) AUTHORIZING DEBTOR
(I) TO OBTAIN POST-PETITION FINANCING AND GRANTING
SECURITY INTERESTS PURSUANT TO 11 U.S.C. §§ 363(b) AND 364(c);
(II) TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363;
(III) TO PROVIDE ADEQUATE PROTECTION PURSUANT TO 11 U.S.C.
§ 361; AND (B) SCHEDULING A FINAL HEARING**

**TO:    THE HONORABLE ROBERT D. DRAIN,
         UNITED STATES BANKRUPTCY JUDGE:**

The above-captioned debtor and debtor-in-possession Shelley Food Stores, Inc. II, (the

"Debtor"), by its proposed attorneys, DelBello Donnellan Weingarten Wise & Wiederkehr, LLP

hereby submit this motion (the "Motion") pursuant to sections 105, 361, 362, 363, 364(c)(1),

364(c)(2), 364(c)(3), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the

"Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "<u>Bankruptcy Rules</u>") for entry of an interim order (the "<u>Interim Order</u>"), *inter alia*,

(i) authorizing the Debtor to obtain senior secured postpetition financing on a secured basis through the factoring/sale of the Debtor's post-petition accounts receivable (the "<u>DIP Facility</u>") pursuant to the terms and conditions of that certain Loan Agreement (as amended, supplemented, restated, or otherwise modified from time to time, the "<u>DIP Agreement</u>") by and between the Debtor and Bay View Funding ("<u>DIP Lender</u>"), substantially in the form attached hereto as **Exhibit A**;

(ii) authorizing the Debtor to execute and deliver the DIP Agreement and the other related credit documents (the "<u>DIP Documents</u>") by and between the Debtor and the DIP Lender, and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii) granting the DIP Facility and all obligations owing thereunder and under the DIP Documents to the DIP Lender (collectively, and including all "<u>Obligations</u>" as described in the DIP Agreement, the "<u>DIP Obligations</u>") allowed secured claim status in the Case (as defined herein);

(iv) granting to the DIP Lender, automatically perfected security interests in and liens upon all of the DIP Collateral (as defined herein);

(v)   authorizing and directing the Debtor to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including, without limitation, closing fees and the reasonable fees and disbursements of the attorneys, advisors, accountants, and other consultants of the DIP Lender, all to the extent provided in and in accordance with the terms of the DIP Documents;

(vi)   authorizing the use of Cash Collateral of the Prepetition Secured Lenders under the Prepetition Credit Documents (each as defined herein), and providing adequate protection to the Prepetition Secured Lenders for any Diminution in Value of its interests in the Prepetition Collateral, including the Cash Collateral (each as defined herein);

(vii)   vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to

implement and effectuate the terms and provisions of the DIP
Documents and this Interim Order, as limited pursuant hereto; and

(viii)  scheduling a final hearing (the "Final Hearing") to consider
the relief requested in the DIP Motion and approval of the DIP
Facility on a final basis and approving the form of notice with
respect to the Final Hearing.

In support of the DIP Motion, the Debtor respectfully states as follows:

## JURISDICTION

1.      The Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this

proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are §§ 105, 361, 362, 363,

364(c)(1), 364(c)(2), 364(c)(3), and 507 of Title 11 of the United States Code, 11 U.S.C. §§101, et

seq. (the "Bankruptcy Code")  and 2002, 4001, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").

## BACKGROUND

3.      On October 23, 2015 (the "Petition Date"), the Debtor filed a voluntary petition

for reorganization pursuant to Chapter 11 of the Bankruptcy Code.

4.      The Debtor has continued in possession of its business and management of its

property pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

5.      No trustee, examiner or creditors' committee has been heretofore appointed in this

proceeding.

6.      The Debtor is a foodservice manufacturer and distributer in the Metro Tri-State

area.

## THE DEBTOR'S PRE-PETITION SECURED DEBT

### A. Santander Bank, N.A.

7.      On July 2, 2014, the Debtor became indebted to Santander Bank, N.A. ("Santander") for loans under a line of credit (the "Line of Credit Loan") up to the principal amount of One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00), as evidenced by a Note of even date for that sum (said note as amended and modified from time to time, the "Line of Credit Note").  On July 2, 2014, the Debtor became indebted to Santander under a term (the "Term Loan") in the principal amount of One Million and 00/100 Dollars ($1,000,000.00), as evidenced by a Note of even date for that sum (said note as amended or modified from time to time, the "Term Note") together with the Line of Credit Note, the "Santander Loan Agreements").

8.      A Security for the Line of Santander Loan Agreements, the Debtor granted Santander a security interest in, among other things and without limitation, substantially all of the Debtor's assets including, but not limited to, then owned or thereafter acquired accounts, instruments, inventory, equipment, chattel paper and general intangibles pursuant to a UCC1 Financing Statement filed on September 18, 2014 (collectively, the "Santander Collateral"). A copy of the Santander Loan Agreements and UCC1 Financing Statement are annexed hereto as **Exhibit "B"**.

9.      Santander has asserted that the liens and security interests granted to Santander were duly perfected and the Debtor agrees and acknowledges that Santander's liens and security interests in the above described Santander Collateral are senior and superior in time and right to all other liens and security interests in the Santander Collateral except for perfected mechanic's liens or purchase money security interests, if any.

4

10.     As of the Filing Date, the outstanding aggregate amounts due Santander from the Debtor under the Santander Loan Agreements was approximately $2,440,000.

**B.      New Jersey Economic Development Authority**

11.     On or about March 23, 2015 the Debtor and New Jersey Economic Development Authority ("NJEDA") entered into a Stronger NJ Business Loan and Security Agreement Working Capital in the principal amount of $1,093,904 (the "NJEDA Loan Agreement").

12.     The Debtor asserts that the Debtor's repayment obligations under the NJEDA Loan Agreement IS secured by a second priority lien and security interest in all personal property of Debtor, as set forth in detail in the NJEDA Loan Agreement, Section 6. Security pursuant to a UCC1 Financing Statement filed on March 12, 2015 (the "NJEDA Collateral" together with the Santander Collateral, the "Cash Collateral"). A copy of the NJEDA Loan Agreement and UCC1 Financing Statement are annexed hereto as **Exhibit "C".**

13.     NJEDA has asserted that the liens and security interests granted to NJEDA were duly perfected and the Debtor agrees and acknowledges that NJEDA's liens and security interests in the above described NJEDA Collateral are junior only to Santander's liens and senior and superior in time and right to all other liens and security interests in the NJEDA Collateral except for perfected mechanic's liens or purchase money security interests, if any.

14.     As of the Filing Date, the aggregate amounts due NJEDA from the Debtor under the NJEDA Loan Agreements is approximately $1,093,940.

15.     The Debtor's assets consist almost entirely of accounts receivable. As of the Petition Date, the Debtor had gross accounts receivable of approximately $1,500,000. Accordingly, the Debtor believes that (a) Santander is undersecured, and (b) NJEDA is wholly unsecured under Section 506(a) of the Bankruptcy Code.

## THE DEBTOR'S NEED FOR POSTPETITION FINANCING

16.     The Debtor filed its Chapter 11 petition with the principal objective to reorganize by first obtaining much needed additional financing, vis-à-vis the DIP Facility, which would improve the Debtor's cash flow and allow the Debtor to stabilize operations, increase sales, and thereafter consummate, through a plan of reorganization, a merger transaction which would expand the Debtor's business and allow it to return to profits and overall refinance the business upon confirmation of the Plan.. As a consequence of the factors described in the Affidavit of Scott Geller, the Debtor currently has insufficient cash to maintain business relationships with its vendors, suppliers, customers and employees, and, in the event that any or all of those relationships are adversely affected by the commencement of this Case, the Debtor will most likely face the prospect of having insufficient cash to finance its operations, to pay its employees and to accomplish its goals for this Chapter 11 Case.

17.     As of the Petition Date, the Debtor's inventory is essentially non-existent due to the Debtor's lack of cash to buy product. The Debtor's operations have essentially ceased prior to the Petition Date. As a result, the Debtor has had to decline purchase orders received as it is unable to fulfill those orders. However, since the Debtor has a well established reputation and good-will in the industry, its customers will continue to send purchase orders once the Debtor is again able to fulfill its purchase orders.

18.     The Debtor urgently needs additional credit and/or capital to acquire inventory as well as mitigate any negative effect of this Case and to restore its business and operations.

Absent availability of new credit, the Debtor's business will not be able to resume and the Debtor will have to have to close its doors and "go dark".[1]

19.    Accordingly, the Debtor requires the availability of working capital from the DIP Facility and the use of Cash Collateral.  The DIP Facility will ensure adequate liquidity pending a sale and will further instill a sense of confidence in the Debtor's customers, vendors, employees, and other important stakeholders.  The Debtor critically needs the support of these stakeholders at this time, as the loss of their support could severely impair the Debtor's ability to preserve its operations.

20.    In sum, without the immediate access to post-petition financing, the Debtor expects to suffer immediate and irreparable harm to its estate and creditors.  The Debtor's ability to preserve the going concern value of its estate for the benefit of its creditors depends upon the interim and final relief requested in this DIP Motion.

### SUMMARY OF THE DEBTOR'S PROPOSED DIP FINANCING[2]

21.    The Debtor has determined, in the exercise of its sound business judgment, that in order to preserve the value of its assets and permit the Debtor to continue focusing its efforts on its reorganization, the Debtor requires post-petition accounts receivable financing.  To that end, the Debtor has, after seeking numerous proposals from other would be DIP lenders, negotiated the DIP Agreement with the DIP Lender, which essentially provides for factoring of the Debtor's post-petition receivables.

---

[1] Santander has made it quite clear to the Debtor that it is not interested in extending any further credit to the Debtor.
[2] The summaries and descriptions of the terms and conditions of the DIP Agreement and the proposed Interim Order set forth in the DIP Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in their entirety by the DIP Agreement and the Interim Order.  In the event there is a conflict between the DIP Motion and the DIP Agreement or the Interim Order, the DIP Agreement and/or the Interim

22.     Under the DIP Facility, the Debtor would receive a purchase order from its customer. The DIP Lender immediately finances and advances to, or on behalf of, the Debtor, eighty percent (80%) of invoices up to ninety (90) days from the invoice date, and sixty percent (60%) of invoices ninety-one (91) to one hundred twenty (120) days from invoice date. Once the purchase order is complete and an invoice is issued, generating a receivable, said receivable is assigned to the DIP Lender. Since the DIP Lender is not factoring pre-petition, or "old" receivables, rather prospective, post-petition new receivables, the DIP Lender requires a first priority lien on the post-petition new receivables, without any prejudice to the Secured Lender's existing liens on pre-petition assets of the Debtor, including, but not limited to, pre-petition accounts receivable.

23.     The terms of the DIP Facility are more specifically set forth in the DIP Agreement attached hereto as **Exhibit "A**." The key provisions of the DIP Agreement are as follows:

Lender: Bay View Funding

Borrower: Shelley Food Service, Inc. II

Maximum Credit: $3,000,000 (Three Million Dollars).

Advance Rate: eighty percent (80%) of invoices up to ninety (90) days from the invoice date and sixty percent (60%) of invoices ninety-one (91) to one hundred twenty (120) days from invoice date (as defined in the DIP Agreement).

Recourse: One Hundred Twenty (120) days from invoice date.

Term:  Initial term of twelve (12) months with twelve (12) month renewal. Sixty (60) day notice required for termination.

DIP Liens: In order to secure the DIP Obligations, effective immediately upon entry of the Interim Order, pursuant to sections 361, 362, and 364(c)(2) of the Bankruptcy Code, the DIP Lender is hereby granted continuing, valid, binding, enforceable, non-avoidable,

---

Order, as applicable, shall control in all respects.  Any capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Documents and/or the Interim Order.

and automatically and properly perfected postpetition security interests in and liens upon (collectively, the "DIP Lien") the Debtor's postpetition accounts receivable (the "DIP Collateral").

<u>Fees</u>: Factoring fee of eight tenths of one percent (0.80%) for the each ten (10) days that each financed invoice remains outstanding, based on the face amount of each financed invoice.

<u>Monthly Minimum Fee</u>: One quarter of one percent (0.25%) of the proposed Maximum Credit per month, for each month of the term. If the monthly fees earned equal or exceed the sated amount, a Monthly Minimum Fee will not be charged for the month.

<u>Due Diligence Fee</u>: $1,500 (nonrefundable) payable upon acceptance of this proposal.

<u>Legal Fee</u>:  $5,000 payable upon acceptance of this proposal. Such amount will be applied against the legal expense associated with seeking bankruptcy court approval for this DIP Facility.

<u>Additional Fees</u>: Wire transfer fee $15.95. ACH fee $7.00

## **REQUEST FOR APPROVAL OF THE DIP FACILITY**

24.     As described above, it is essential to the success of the Case that the Debtor immediately obtain access to sufficient post-petition financing, without which the Debtor's ability to maintain its business operations will be compromised.  The Debtor's ability to acquire inventory to resume accepting and fulfilling purchase orders is contingent on upon the expeditious approval of the DIP Facility and the related actions requested herein. Without the DIP Facility, the Debtor's operations will not be able to resume and the Debtor will shut its doors and "go dark". Section 363(b) of the Bankruptcy Code provides that the Debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b). Section 363(f) of the Bankruptcy Code permits the Debtor to sell property under §363(b) free and clear of liens and claims of other entities if such entities consent.  Here, the requirements of section 363(f) are satisfied inasmuch as the DIP Lender is the only entity with an interest in the post-petition accounts receivable that solely their financing will

generate, and they will be paid in full as provided for herein and as such, upon information and belief, they consent to the proposed DIP Facility.

25.     Section 364 of the Bankruptcy Code[3] distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security.  If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, pursuant to Section 364(c) of the Bankruptcy Code, a court may authorize a debtor-in-possession to obtain credit or incur debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or combination of the foregoing.

26.     As a condition to entering into the DIP Agreement and obtaining the Debtor's needed liquidity, the Debtor must obtain authorization, pursuant to section 364(c) of the Bankruptcy Code, (a) to grant the DIP Lender automatically perfected security interests in and liens upon all of the DIP Collateral, including, without limitation, all post-petition accounts receivable and the proceeds thereof, and (b) grant the DIP Obligations allowed Superpriority administrative expense claim status in the Case and any Successor Case.

---

[3] Section 364(c) of the Bankruptcy Code provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503 (b) or 507 (b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

A.        **Approval Under Section 364(c) of the Bankruptcy Code**

27.      The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor-in-possession is "unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense."  *See In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "although a debtor is not required to seek credit from every possible source, a debtor must show that it has made a reasonable effort to seek other sources of credit available under section 364(a) & (b)").

B.        **The Debtor Was Unable to Obtain Necessary Postpetition Financing on an Unsecured Basis Under Section 364(a) or (b) of the Bankruptcy Code**

28.      As set forth in the Geller Affidavit, and as the evidence at the Final Hearing will show, the Debtor could not have obtained a working capital/loan facility of the type and magnitude required in this Case on an unsecured or even junior secured basis.

29.      To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate by good faith effort that credit was not available without the protections of section 364(c) of the Bankruptcy Code.  *See also Ames,* 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders).

30.      The Debtor submits that, other than the DIP Facility, there are no better financing alternatives available under the circumstances.  In the Spring, 2015, the Debtor requested Santander to extend further credit to help with the cash flow constraints. However, Santander declined to fund. The Debtor spent several months attempting to find alternative financing, submitting financial statements to over 17 financial institutions including, NJEDA, Bank of

11

America, TD Bank, and Chase. The Debtor obtained only one (1) other factoring proposal, which required the same security under Section 364(c) of the Bankruptcy Code, but with less favorable terms than the DIP Lender.

31.    Moreover, as noted above, all of the Debtor's pre-petition assets are fully encumbered by liens and security interests.  Alternative financing in an amount sufficient to repay those creditors and provide additional liquidity is simply not available given the current state of the financial markets, the nature and state of the Debtor's business operations and the size of the financing required.  Even if alternative debtor-in-possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtor's liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the Prepetition Secured Lenders, the results of which could not be predicted with certainty.  Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtor, immediately jeopardizing its Chapter 11 case at the outset.

**C.        The Postpetition Loan is Necessary to Preserve Assets of the Debtor's Estate**

32.    As stated above, the DIP Facility is essential so that the Debtor can restart and resume its operations and immediately begin accepting and fulfilling purchase orders.  Absent resuming accepting and fulfilling purchase orders the Debtor's business, the Debtor will not be able to conduct business at all.

33.    The success of this case thus entirely depends on the Debtor resuming full operations.  If the DIP Motion is denied or delayed, the Debtor will not be able to resume operations and "go dark" and the success of the Chapter 11 case might be irreparably damaged. In contrast, once the DIP Facility is approved, the Debtor's ability to acquire inventory to accept

and fulfill purchase orders will resume.  The Debtor's needs for access to the DIP Facility are, therefore, urgent and immediate.

**D.**  **The Terms of the DIP Facility are Fair, Reasonable and Appropriate**

34.  In the Debtor's considered business judgment, the DIP Facility is the best financing option available in the circumstances of this case.  The purpose of the facility is to enable the Debtor to maintain the value of its estate while pursuing a going concern sale of the Debtor's business for the benefit of all stakeholders.

35.  The proposed DIP Facility provides, generally, that the liens granted to the DIP Lender with respect to the DIP Facility shall be subject and subordinate to a carve-out of the DIP Liens equal to the sum of (i) allowed, accrued, but unpaid professional fees and expenses of the Debtor and Creditors Committee, if any, (ii) proceeds from recoveries under Sections 542 through 553 of the Bankruptcy Code, (iii) the payment of fees pursuant to 28 U.S.C. § 1930 and 31 USC 3717, and (iv) the fees and expenses of a hypothetical Chapter 7 Trustee not to exceed $10,000. In *Ames Department Store,* the bankruptcy court found that such "carve-outs" are not only reasonable but are necessary to insure that official committees and debtors' estates are adequately assisted by counsel. *Ames,* 115 B.R. at 40.

**E.**  **Application of the Business Judgment Standard**

36.  After appropriate and extensive investigations and analysis, and robust, good faith, and arm's length negotiations among the Debtor and the DIP Lender, the Debtor's management concluded that the DIP Facility and the use of Cash Collateral is the best alternative available in the circumstances of these cases.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.,* 163 B.R. 964, 974

(Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment on behalf of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); *In re TM Carlton House Partners, LTD,* 91 B.R. 349, 357 (Bankr. E.D. Pa. 1988) (holding that due to the debtor's distinct awareness of its own financial needs, the court would not second-guess its business judgment to put aside cash to effectuate a refinancing of its debts); *cf. Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.,* 318 U.S. 523, 550 (1943) (holding that decisions regarding the rejection or assumption of a lease is left to the business judgment of the debtor); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus. Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor-in-possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

37.     The Debtor has exercised sound business judgment in determining that a post-petition credit facility is appropriate and has satisfied the legal prerequisites to incur debt under the DIP Facility.  The terms of the DIP Agreement are fair and reasonable and are in the best interests of the Debtor's estate.  Accordingly, the Debtor should be granted authority to enter into the DIP Agreement and obtain funds from the DIP Lender on the senior secured, administrative

"superpriority" basis described above, pursuant to sections 364(c) and (d) of the Bankruptcy Code.

## REQUEST FOR USE OF CASH COLLATERAL

38.     Further, by this this Motion, the Debtor seeks authority to use property which may constitute cash collateral in which Santander and NJEDA (collectively, the "Prepetition Secured Lenders") may asserted a security interest in said cash collateral.  The Debtor believes that the Prepetition Secured Lenders are the only parties that have a perfected security interest in the Debtor's property which may constitute Cash Collateral.

39.     The Debtor seeks the authority to use cash collateral pursuant to 11 U.S.C. §§363 (c)(1) and (2) and Bankruptcy Rule 4001(c) through the collection and usage of pre-petition accounts receivable to the extent necessary to continue the operation of its business and to preserve the value of its estate pending a final hearing.

40.     § 363(a) of the Bankruptcy Code states as follows:

> "In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of properties subject to a security interest as provided in Section 552(b) of this title, whether existing before or after the commencement of a case under this title."

41.     § 363(c)(1) of the Bankruptcy Code provides as follows:

> "(c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, 1304, 1203, or 1204 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing".

42.    § 363(d) of the Bankruptcy Code provides as follows:

"(d) The trustee may use, sell, or lease property under subsection (b) or (c) of this section only to the extent not inconsistent with any relief granted under section 362(c), 362(e), or 362(f) of this title".

43.    Accordingly, pursuant to § 363(c)(2) of the Code, the consent of the Prepetition Secured Lenders or authority from this Court is required to use cash collateral in which the Secured Creditors holds a perfected, first priority security interest.

44.    The purpose of adequate protection is to ensure that the secured creditor receives the value for which it bargained pre-bankruptcy. *In re Swedeland Development Group, Inc.,* 16 F.3d 552 (3rd Cir. 1994); *In re Dunes Casino Hotel,* 69 B.R. 784, 793 (Bankr, D.N.J. 1986), *citing In re Coors of the Cumberland,* 19 B.R. 313 (Bankr. M.D. Tenn. 1982) S*ee In re 495 Central Park Ave. Corp.,* 136 B.R. 626 (Bankr. S.D.N.Y. 1992).   Adequate protection is designed to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization. *In re Nice,* 355 B.R. 554, 563 (Bankr. N.D. Va. 2006) ("adequate protection is solely a function of preserving the value of the creditor's secured claim as of the petition date due to a debtor's continued use of the collateral").

45.    Because the term "adequate protection" is not defined in the Bankruptcy Code, the precise contours of the concept are necessarily determined on a case-by-case basis. *MBank Dallas, N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393 (10th Cir. 1987).  *In re Snowshoe Co.,* 789 F.2d 1085, 1088 (4th Cir. 1086); *In re Mosello,* 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Beker Industries Corp.,* 58 B.R. 725 (Bankr. S.D.N.Y. 1986); *see also In re JKJ Chevrolet, Inc.* 190 B.R. 542, 545 (Bankr. E.D.Va. 1995) (adequate protection is a flexible concept that is determined by considering the facts of each case).

46.    In addition to the existing rights and interests of the Prepetition Secured Lenders and for the purpose of adequately protecting Prepetition Secured Lenders from Collateral Diminution[4], the Debtor proposes that the Prepetition Secured Lenders  be granted replacement liens ("Replacement Liens") in their respective pre-petition Collateral, to the extent that said liens were valid, perfected and enforceable as of the Petition Date in the continuing order of priority of the Pre-Petition Liens without determination herein as to the nature, extent and validity of said pre-petition liens and claims and to the extent Collateral Diminution occurs during the Chapter 11 case, subject to: (i) the claims of Chapter 11 professionals duly retained and to the extent awarded pursuant to Sections 330 or 331 of the  Bankruptcy Code or pursuant to any monthly fee order entered in the Chapter 11 case; (ii) United States Trustee fees pursuant to 28 U.S.C. Section 1930 and 31 U.S.C. Section 3717; (iii) the proceeds of any recoveries of estate causes of action under Sections 542 through 553 of the Bankruptcy Code; and (iv) the fees and expenses of a hypothetical Chapter 7 trustee to the extent of $10,000.

47.    In addition to the liens and security interests proposed to be granted pursuant hereto, the Debtor shall make monthly adequate protection payments to Santander in the amount of $10,000 which amount is reasonably equivalent to contract rate interest on the outstanding indebtedness. As NJEDA is wholly unsecured, no adequate protection payments are permitted to them under Section 506 of the Bankruptcy Code.

48.    The proposed adequate protection to the Prepetition Secured Lenders is appropriate because it is designed to protect the Prepetition Secured Lenders against diminution

---

[4] For purposes of this Order, "Collateral Diminution" shall mean any diminution in value of the Secured Creditors' interests in Debtor's property as of the Filing Date by reason of Debtor's use of Cash Collateral in accordance with this Order.

in the value of the Prepetition Secured Lenders' interest in the Cash Collateral. As such, the

Prepetition Secured Lenders' interest in the Cash Collateral is adequately protected.

49.    The Debtor proposes to use the Cash Collateral only for ordinary and necessary

operating expenses substantially in accordance with the operating budget annexed hereto as

**Exhibit "D"** (the "Budget"). The Debtor believes that the Budget includes all reasonable,

necessary and foreseeable expenses to be incurred in the ordinary course of business for the

period set forth in the Budget. The Debtor believes that the use of cash collateral in accordance

with the Budget will provide the Debtor with adequate liquidity to pay administrative expenses

as they become due and payable during the period covered by the Budget. The Debtor anticipates

to use $780,108.00 of Cash Collateral during the approximate thirty (30) day interim period

pending a final hearing.

## REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY

50.    In order to successfully implement the foregoing, the Debtor respectfully requests

that the Court waive the notice requirements provided for by Bankruptcy Rule 6004(a), the

twenty-day stay provided for by Bankruptcy Rule 6003(b), and the ten-day stay provided for by

Bankruptcy Rule 6004(h). The Debtor believes, for the reasons set forth above, that ample

justification exists for the Court to waive Bankruptcy Rule 6003(b), 6004(a), and 6004(h).

## REQUEST FOR WAIVER OF STAY

51.    The Debtor further seeks a waiver of the stay of the effectiveness of the Interim

Order, and any subsequent Order, that may be imposed by any applicable Bankruptcy Rule. As

set forth above, the use of Cash Collateral is essential to prevent potentially irreparable damage

to the Debtor's operations, value and ability to reorganize. Accordingly, the Debtor submits that

sufficient cause exists to justify a waiver of any stay imposed by the Bankruptcy Rules, to the

extent applicable.

## REQUEST FOR HEARING ON SHORTENED NOTICE FOR INTERIM
## RELIEF PURSUANT TO LOCAL BANKRUPTCY RULE 9077-1

52.      In connection with the relief requested in the Motion herein, the Debtor is seeking

a hearing on shortened notice to consider authority to, *inter alia*, authorization to obtain DIP

financing, and use the cash collateral of the DIP Lender on an interim basis pursuant to §§364(d)

and 363(c)(2), and 361 of the Bankruptcy Code  and Federal Rule of Bankruptcy Procedure 4001.

53.      As stated hereinabove, the Debtor does not have sufficient inventory to fulfill

purchase orders, nor does the Debtor have any cash on hand to replenish its inventory. Prior to

the Filing Date, the Debtor had exhausted substantially all of its cash assets, and was left in a

position without cash to continue its operations. The Debtor explored numerous avenues of

lending pre-filing, but, however, was unable to find any lender willing to lend to the Debtor

given its current debt structure. The only avenue by which any lender would consider lending to

the Debtor would be if the proposed factoring of post-petition receivables, under Section 364(c)

of the Bankruptcy Code.

54.      In order to preserve the Debtor's assets and value as a "going concern" pending a

sale in this Bankruptcy Case, DIP Financing is necessary to provide the Debtor with adequate

cash flow to meet its very minimum operating expenses and administrative costs of maintaining

its estate.

55.      As set forth in the Budget, the Debtor immediately requires financing to acquire

inventory to resume operations and fulfill purchase orders. The Debtor does not have any cash

reserves to acquire inventory, let alone sustain operations, and thus immediate funding is necessary to prevent irreparable harm and damage to the Debtor's estate.

56.    Furthermore, the immediate and continued use of cash collateral is essential to the operation of the Debtor's business and value of its assets, and will not only preserve the estate but will help to maximize its value for the benefit of its creditors. Without the immediate, pre-final hearing authority to use cash collateral on an interim basis and pending the final hearing, the Debtor will not be able to make payroll and other imminent and necessary expenses to sustain its operations. If the Debtor is not permitted to immediately use cash collateral, the Debtor's business will be in jeopardy by virtue of the Debtor's inability, under such circumstances, to pay its employees and the daily costs and expenses associated with its daily business operations. As such, the Debtor submits that its request for interim use of cash collateral herein is reasonable, proper and in the best interests of its creditors.

57.    The Debtor therefore desires to obtain authority to obtain DIP Financing and use cash collateral of the DIP Lender on an interim basis pending a final hearing, pursuant to and in accordance with the Budget.

58.    The Bankruptcy Rules provide for a shortening of time under certain circumstances. Bankruptcy Rule 9006(c) provides as follows:

(c) *Reduction.*

(1) *In General*. Except as provided in paragraph (2) of this subdivision, when an act is required or allowed to be done at or within a specified time by these rules or by a notice given thereunder or by order of court, the court for cause shown may in its discretion with or without motion or notice order the period reduced.

(2) *Reduction Not Permitted*. The court may not reduce the time for taking action under Rules 2002 (a)(4) and (a)(8), 2003(a), 3002(c), 3014, 3015, 4001(b)(2), (c)(2), 4003(a), 4004(a), 4007(c), 8002, and 9033(b).

59.     Thus, the Bankruptcy Rules specifically authorize the Court to hear a motion such as the Motion herein on shortened notice, for cause shown.

60.     The Debtor respectfully submits that sufficient cause exists for scheduling a hearing on shortened notice to consider the Motion and refers the Court to the Affidavit of Scott Geller Pursuant to Local Bankruptcy Rules 1007-2 and 9077-1 in support of an order scheduling hearing on shortened notice on First Day Motions, which is on file on the Court's docket.

61.     Notice of this Motion will be provided as set forth in the Order Scheduling Hearing to be entered by the Court. The Debtor submits that said notice is adequate and proper.

62.     In the event the Court does not find cause to shorten the notice period for this Motion, this Motion will be provided on twenty-one (21) days notice to (i) Office of the United States Trustee; (ii) parties who have filed notices of appearance; and (iii) all creditors. The Debtor submits that said notice is adequate and proper.

## NO PREVIOUS RELIEF REQUESTED

63.     The Debtor has not previously sought the relief requested herein from this Court or any other court.

**WHEREFORE**, the Debtor respectfully requests that the Court (i) GRANT the Motion, (ii) enter the Interim Order, substantially in the form attached hereto as **Exhibit "E"**, granting the relief requested; (iii) set the Final Hearing; and (iv) grant such other and further relief as is just and proper.

Dated: White Plains, New York
      October 23, 2015

                      DELBELLO DONNELLAN WEINGARTEN
                      WISE & WIEDERKEHR, LLP
                      Attorneys for the Debtor
                      One North Lexington Avenue
                      White Plains, New York 10601
                      (914) 681-0200

                      By: */s/ Jonathan S. Pasternak*
                      Jonathan S. Pasternak